UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
TRANSATLANTIC REINSURANCE COMPANY, :
FAIR AMERICAN INSURANCE AND              :     No.  14 Civ. 2109 (ER) (DCF)
REINSURANCE COMPANY (F/K/A PUTNAM  :
REINSURANCE COMPANY)                     :
                                         :
                                         :
                                         :
                  Petitioners,           :
                                         :
          v.                             :
                                         :     ECF CASE
NATIONAL INDEMNITY COMPANY               :
                                         :
                  Respondent.            :
                                         :
                                         :
-----------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION

Michael A. Knoerzer (MK 8438)
Stephen M. Kennedy (SK 5572)
CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, NY 10174
Telephone: (212) 710-3900
Facsimile: (212) 710-3950

*Attorneys for National Indemnity Company*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 4

I.    From 1978 To 1992, The AIG Insurers Purchased Reinsurance From TRC
      And Putnam ........................................................................................... 4

II.   In 2011, The AIG Insurers Purchased Additional Reinsurance From
      Eaglestone And Eaglestone Purchased Reinsurance From NICO ...................... 4

III.  The AIG Insurers' Disputes With TRC and Putnam ..................................... 6

IV.   The Arbitration Demand Letters Do Not Assert Any Claim Against NICO
      And Are Otherwise Invalid ....................................................................... 7

V.    On The Eve Of A Court Hearing, TRC And Putnam Dropped Their Claim
      That Non-Signatory Eaglestone Must Arbitrate Under An Estoppel Theory ........ 8

VI.   Despite Conceding That Non-Signatory Eaglestone Need Not Arbitrate, TRC
      And Putnam Continue To Press Non-Signatory NICO To Arbitrate .................. 9

ARGUMENT .................................................................................................. 9

I.    TRC And Putnam Are Not "Aggrieved Parties" Under 9 U.S.C. § 4 Because
      They Can Raise Their Defense To Payment In Arbitrations With The AIG
      Insurers Without NICO Being A Party; Therefore The Court Should Not
      Compel NICO To Arbitrate ....................................................................... 9

II.   NICO Cannot Be Compelled To Arbitrate With TRC And Putnam Because It
      Is Not A Signatory To Any Of The AIG-TRC Reinsurance Agreements And
      Did Not Otherwise Agree To Arbitrate ...................................................... 11

III.  NICO Has Not Knowingly Exploited The AIG-TRC Reinsurance
      Agreements For Its Direct Benefit And So Cannot Be Bound To The AIG
      Insurers' Obligations Under The Agreements By Estoppel ............................ 12

      A.    NICO Has Not "Knowingly Exploited" The AIG-TRC Reinsurance
            Agreements For Its "Direct Benefit" ............................................... 13

            1.    The Sworn Statements And Other Evidence Contradict TRC And
                  Putnam's Conclusory Theory That NICO Has "Taken Over,"
                  "Supplanted" or "Substituted" For The AIG Insurers ................ 13

            2.    NICO's Role As A Claims Administrator Does Not Provide It With
                  "Direct Benefits" Under The AIG-TRC Reinsurance Agreements ...... 14

            3.    NICO's Role As Reinsurer of Eaglestone Does Not Provide It With
                  "Direct Benefits" Under The AIG-TRC Reinsurance Agreements ...... 17

      B.    The Second Circuit's Refusal To Apply The Estoppel Exception In
            Much More Extreme Circumstances Shows That It Does Not Apply
            Here .................................................................................................. 18

      C.    The Cases Relied On By Petitioners Are Inapposite ........................... 21

IV.   It Is Improper For This Court To Compel Arbitration Under The 20 AIG-
      TRC Reinsurance Agreements That Do Not Provide For Arbitration In New
      York .............................................................................................................. 23

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179 (S.D. Tex. 2008) ............................... 21, 23

*Alfa Laval U.S. Treasury Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  857 F. Supp. 2d 404 (S.D.N.Y. 2012) ................................................................. 21, 22

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir.
  1999) .......................................................................................................................... 23

*American Home Assurance Co. v. Transatlantic Reinsurance Co.*, Index No.
  650811/2014 (Sup. Ct. N.Y. Cnty. Mar. 13, 2014) .................................................. 8

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) .................... 11

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.* No. 08-civ-
  02152, 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008) .......................................... 20, 21

*Couleur Int'l Ltd. v. Saint-Tropez W., a Div. of Ca. Fashion Indus., Inc.*, 547
  F. Supp. 176 (S.D.N.Y. 1982) .................................................................................. 24

*Eaglestone Reinsurance Co. v. Transatlantic Reinsurance Co.*, Index No.
  650808/2014 (Sup. Ct. N.Y. Cnty. Mar. 13, 2014) .................................................. 8

*Grenawalt v. AT&T Mobility, LLC*, 937 F. Supp. 2d 438 (S.D.N.Y. 2013) ................. 11

*HRH Construction LLC v. Metro. Transp. Auth.*, 33 A.D.3d 568 (1st Dep't
  2006) .................................................................................................................... 21, 22

*In re Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626 (2013) ............................ 12

*J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70
  (S.D.N.Y. 2010) ........................................................................................................ 24

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58
  (2d Cir. 2001) ................................................................................................ 12, 19, 20

*Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations.*, 107 F.3d 979 (2d
  Cir. 1997) .................................................................................................................. 12

*Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir.
  1996) .................................................................................................................... 11, 12

*National Indemnity Co. v. Transatlantic Reinsurance Co.*, No. 8:14-cv-00074
  (D. Neb. Filed March 4, 2014) ................................................................................... 9

*Provident Bank v. Kabas*, 141 F. Supp. 2d 310 (E.D.N.Y. 2001) .............................. 24

*Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17 (2d Cir. 2002) ............................ 11

*Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487 (NRB), 2004 WL 307238
  (S.D.N.Y. Feb. 13, 2004) .......................................................................................... 12

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) ..... 11, 18, 19

*Transatlantic Reinsurance Co. v. National Indemnity Co.*, Index No.
  650880/2014 (Sup. Ct. N.Y. Cnty. Mar. 19, 2014) ................................................... 9

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574
  (1960) ........................................................................................................................ 11

**Statutes**

9 U.S.C. § 4 (2012) ............................................................................................... 10, 23

Respondent National Indemnity Company ("NICO") respectfully submits this memorandum of law, together with (i) the declaration of Brian Snover (the "Snover Decl."), (ii) the declaration of Patricia Fox (the "Fox Decl."), and (iii) the declaration of Stephen Kennedy (the "Kennedy Decl."), in opposition to the March 19, 2014 petition to compel arbitration filed by Transatlantic Reinsurance Company ("TRC") and its subsidiary Fair American Insurance and Reinsurance Company (formerly known as Putnam Reinsurance Company) ("Putnam").

## PRELIMINARY STATEMENT

NICO cannot be compelled to arbitrate with TRC and Putnam because it is not a signatory to any arbitration agreement with TRC and Putnam. Further, for the reasons set forth below no judicially created "estoppel" exception allows the Court to compel NICO to arbitrate.

In the 1970s, 1980s and 1990s, certain American International Group-affiliated insurance companies ("AIG Insurers") purchased reinsurance from TRC and Putnam. TRC and Putnam indemnified the AIG Insurers under these reinsurance contracts for decades. In 2012, TRC and Putnam were acquired by Alleghany Corporation and stopped making payments to the AIG Insurers under the reinsurance contracts that the AIG Insurers had paid for decades earlier. Over the past 2 years, the AIG Insurers have instituted multiple lawsuits and at least 9 arbitration proceedings against TRC and Putnam based on TRC and Putnam's new "no pay" position. NICO has not been a party to any of these disputes and, until now, none of the AIG Insurers, TRC or Putnam sought to add NICO as a party to any of these existing disputes. TRC and Putnam have now tried to start two new "omnibus" arbitration proceedings under 41 different contracts with various AIG Insurers (including several of the same contracts that are already at issue in the pending arbitrations). The relief TRC and Putnam seek in these new "omnibus" arbitrations is a declaration that their defenses to paying the AIG Insurers are correct. TRC and

Putnam seek to compel NICO to join these arbitrations but do not articulate any claims against NICO nor do they explain why they need NICO to participate as a party in disputes between the AIG Insurers, TRC and Putnam.

The only arguable connection that NICO has to the disputes between the AIG Insurers, TRC and Putnam is that, in 2011, the AIG Insurers purchased reinsurance from Eaglestone Reinsurance Company ("Eaglestone") for a sliver of the AIG Insurers' total risks and Eaglestone purchased reinsurance for a portion of those risks as well as administrative services from NICO in connection with certain legacy asbestos claims. TRC and Putnam apparently contend that this routine reinsurance transaction somehow relieves TRC and Putnam from their contractual obligation to pay the AIG Insurers. Since it is undisputed that NICO did not agree to arbitrate with TRC or Putnam, TRC and Putnam rely on a judicially-created "estoppel" exception to the rule that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (internal quotation marks omitted). TRC and Putnam argue that NICO is bound by commitments to arbitrate that the AIG Insurers (*i.e.*, not NICO) made in contracts between the AIG Insurers and TRC or Putnam decades earlier because NICO has knowingly asserted rights under those contracts for their direct benefit. *See MAG Portfolio Consult., GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001). TRC and Putnam are wrong.

This "estoppel" exception is typically applied in circumstances where non-signatories are refusing to arbitrate under agreements signed by their corporate affiliates (and it has only very rarely been applied by any courts outside of this corporate affiliate context). NICO is not a corporate affiliate of the AIG Insurers. It is a separate company that simply entered into a business transaction with the AIG Insurers and Eaglestone in 2011 and therefore the exception

2

does not apply.  Moreover, TRC's and Putnam's estoppel argument is premised on the assertion that NICO actually "assumed" all of their rights and obligations under the AIG Insurers' contracts with TRC and Putnam thereby becoming the alleged "real party in interest".  TRC and Putnam do not really believe their own argument, however, because just yesterday, the TRC/Putnam official who initiated the arbitrations at issue (Wesley Sherman) wrote that NICO has *"no rights or authority under [TRC's] contracts with AIG."*  Snover Decl. Ex. C at 1 (emphasis added).

In any event, the so-called "evidence" that TRC and Putnam rely on to support their assertion that NICO assumed the AIG Insurers' rights and obligations under the AIG-TRC contracts consists primarily of out-of-context and misleading partial quotes from the 2011 transaction documents among Eaglestone, AIG Insurers and NICO.  As part of the routine reinsurance business arrangement between the AIG Insurers, Eaglestone and NICO in 2011, NICO agreed to provide certain administrative services to the AIG Insurers related to the AIG Insurers' asbestos-related liability.  These services include typical services of a third-party administrator (TPA), including, among other things, helping the AIG Insurers collect on some of their reinsurance such as the reinsurance they purchased from TRC and Putnam in the 1970s, 1980s, and 1990s.  The services are provided pursuant to a written Administrative Services Agreement, which explicitly states that NICO is performing these services "on behalf of" the AIG Insurers (rather than by NICO for NICO as TRC and Putnam suggest).  Snover Decl. Ex. F § 6.1.  TRC and Putnam harp on the fact that NICO sends them bills, yet they neglect to mention that these bills are sent *on behalf of* the AIG Insurers and for the direct benefit of the AIG Insurers so the AIG Insurers can collect the money that is owed to them by TRC and Putnam.

All of the AIG Insurers' rights to payment remain their own; NICO did not assume them and does not own them.

There is simply no basis to require NICO to participate in arbitrations with TRC or Putnam.  NICO has never agreed to arbitrate with TRC or Putnam.  TRC and Putnam do not assert any claims against NICO in any event.  TRC's and Putnam's petition to compel NICO to arbitrate should be denied.

## STATEMENT OF FACTS

**I.     From 1978 To 1992, The AIG Insurers Purchased Reinsurance From TRC And Putnam**

Between 1978 and 1992, various AIG-affiliated insurance companies purchased reinsurance from TRC and/or Putnam.  Fox Decl. ¶ 4-5.  Under each reinsurance contract or "treaty", the AIG Insurer purchasing reinsurance paid a premium to TRC and/or Putnam.  In exchange for this money, TRC and/or Putnam agreed to indemnify the AIG Insurer for a portion of its potential losses. *See, e.g.,* Levene Decl. Exs. 1-34.  Between 1978 and 1992, more than 20 different AIG Insurers purchased reinsurance from TRC and/or Putnam pursuant to at least 41 different reinsurance agreements (the "AIG-TRC Reinsurance Agreements").

NICO is not party to any of the AIG-TRC Reinsurance Agreements.  Fox Decl. ¶ 8; Snover Decl. ¶ 8.  NICO also is not and never has been a subsidiary, parent, or affiliate of any party to the AIG-TRC Reinsurance Agreements.  Snover Decl. ¶ 9.  NICO also has not asserted any rights of its own under the AIG-TRC Reinsurance Agreements, nor has it expressed an intent to do so.  Snover Decl. ¶ 11.

**II.    In 2011, The AIG Insurers Purchased Additional Reinsurance From Eaglestone And Eaglestone Purchased Reinsurance From NICO**

In 2011, certain AIG Insurers purchased reinsurance from Eaglestone for a sliver of their total risk.  The AIG Insurers paid Eaglestone approximately $2.7 billion in exchange for

4

approximately $5 billion in reinsurance from Eaglestone.  Snover Decl. Ex. E at 9, 14.

Eaglestone then paid approximately $1.6 billion for approximately $3.5 billion of reinsurance

from NICO for certain asbestos-related liabilities only.  Snover Decl. Ex. D at 13.  No other

liabilities are reinsured by NICO.

    For that premium, NICO also agreed to provide certain administrative services to

various AIG Insurers related only to those asbestos-related liabilities.  Snover Decl. Ex. F at §

4.1.  The administrative services include, among other things, management of policyholders'

claims and collection of reinsurance related to asbestos-liabilities.  *Id.* at § 6.1.  The

Administrative Services Agreement between the AIG Insurers and NICO (the "ASA") makes

clear that NICO, through its subsidiary Resolute Management Inc. ("Resolute"), acts on behalf of

and for the benefit of the AIG Insurers.  For example, the first page of the agreement states that

"[the AIG Insurers] desire that NICO perform certain administrative functions *on behalf of the*

*[the AIG Insurers]* from and after the date hereof with respect to the Subject Asbestos

Liabilities."  *Id.* at 1 (emphasis added).  With respect to NICO's role in assisting the AIG

Insurers to collect on the AIG Insurers' reinsurance, the ASA expressly states that NICO will

administer and collect such reinsurance "on behalf of" the applicable AIG Insurer.  *See id.* at §

6.1 ("In performing the Administrative Services with respect to the Third Party Reinsurance

Agreements within the Scope of Service, NICO shall . . . (i) administer and collect, *on behalf of*

and in the name of the applicable [AIG Insurer], Included Reinsurance Recoverables . . . .").

TRC and Putnam had no involvement with these arms-length business transactions.  Notwithstanding these transactions, AIG Insurers' rights or obligations under contracts with TRC or Putnam remain with the AIG Insurers.  Fox Decl. ¶ 11.[1]

## III.    The AIG Insurers' Disputes With TRC and Putnam

In 2012, after decades of paying the AIG Insurers, TRC and Putnam were acquired by Alleghany Corporation and stopped making payments to the AIG Insurers under the reinsurance contracts that the AIG Insurers had paid for decades earlier.  TRC's and Putnam's stated "excuse" for their non-payment to the AIG Insurers is that the 2011 transaction between the AIG Insurers, Eaglestone and NICO somehow relieves TRC and Putnam of all reinsurance obligations under the AIG-TRC Reinsurance Agreements.  Since that time, various AIG Insurers have commenced multiple litigations and at least 9 arbitrations against TRC and/or Putnam alleging that TRC and/or Putnam breached the relevant AIG-TRC Reinsurance Agreement by failing to pay the amounts it agreed to pay.  Fox Decl. ¶ 26.

On March 3, 2014, TRC and Putnam sent two letters demanding arbitration against the AIG Insurers, Eaglestone, and NICO under the 41 AIG-TRC Reinsurance Agreements (the "Arbitration Demand Letters").  Snover Decl. Exs. A and B.  At least 4 of these AIG-TRC Reinsurance Agreements were already the subject of pending arbitrations initiated by an AIG Insurer against TRC or Putnam.  Fox Decl. ¶ 27.  The Arbitration Demand Letters

---

[1]    TRC and Putnam claim that the liabilities that the AIG Insurers reinsured in 2011 "are the same liabilities that TRC had reinsured under the [AIG-TRC Reinsurance Agreements]".  TRC Br. at 9.  While the Court need not address this issue, this is not a correct statement of the relevant contracts.  The AIG Insurers did not purchase reinsurance in 2011 for liabilities that they had already purchased reinsurance for from TRC and Putnam decades earlier.  The reinsurance the AIG Insurers purchased in 2011 was to reimburse them for loss they would otherwise have been liable for after taking into account the reinsurance recovery due from TRC and Putnam.

indicate that TRC and Putnam seek a declaration that they owe no further money to AIG Insurers and seek a return of funds purportedly paid to AIG Insurers.  Snover Decl. Exs. A and B.

## IV.    The Arbitration Demand Letters Do Not Assert Any Claim Against NICO And Are Otherwise Invalid

        The Arbitration Demand Letters do not reference any agreement where NICO and TRC or Putnam agreed to resolve disputes through arbitration.  Snover Decl. Exs. A and B.  This is because there is no agreement where NICO and TRC or Putnam agreed to resolve disputes through arbitration.  The Arbitration Demand Letters also do not articulate any claims by TRC or Putnam against NICO.  *Id.*  The Arbitration Demand Letters concern disputes between the AIG Insurers, TRC and Putnam.  *Id.*  NICO's money is not the subject of the Arbitration Demand Letters.  Fox Decl. ¶ 14; Snover Decl. ¶ 12.  And NICO has never initiated any legal proceedings against TRC or Putnam to enforce rights of its own under the AIG-TRC Reinsurance Agreements.  Snover Decl. ¶ 13.

        The Arbitration Demand Letters do not specify a forum for the requested omnibus arbitrations.  Snover Decl. Exs. A and B.  The AIG-TRC Reinsurance Agreements provide for arbitration in specific fora (unless the parties agree otherwise).  Of the 41 AIG-TRC Reinsurance Agreements, 21 provide for arbitration in New York, NY, 5 provide for arbitration in Boston, MA, 5 provide for arbitration in Los Angeles, CA, 2 provide for arbitration in San Francisco, CA, 1 provides for arbitration in Manchester, NH and 7 provide for arbitration in fora unknown to NICO at this time because TRC and Putnam have not provided copies of the agreements or excerpts of the relevant arbitration provisions (and NICO is not a party to the agreements).[2]

---

[2]      Levene Aff. Exs. 2, 10, 30, 31, 32 (Boston); Exs. 3, 4, 8, 15 (Los Angeles); Exs. 5 and 6 (San Francisco); Ex. 21 (Manchester); Fox Decl. Ex. H, Treaty 8705 (Los Angeles).

**V.      On The Eve Of A Court Hearing, TRC And Putnam Dropped Their Claim That Non-Signatory Eaglestone Must Arbitrate Under An Estoppel Theory**

After receiving the Arbitration Demand Letters, Eaglestone and the AIG Insurers instituted separate actions against TRC and Putnam in New York Supreme Court seeking declaratory and injunctive relief in connection with TRC's and Putnam's improper Arbitration Demands.  These cases are styled (1) *Eaglestone Reinsurance Co. v. Transatlantic Reinsurance Co.*, Index No. 650808/2014 (Sup. Ct. N.Y. Cnty. Mar. 13, 2014) (the "Eaglestone action") and (2) *American Home Assurance Co. v. Transatlantic Reinsurance Co.*, Index No. 650811/2014 (Sup. Ct. N.Y. Cnty. Mar. 13, 2014) (the "AIG Insurers action").  In the Eaglestone action, Eaglestone asserted that it could not be compelled to arbitrate under the AIG-TRC Reinsurance Agreements because it was not a signatory to those agreements and that all it had done was reinsure the AIG Insurers in 2011.  Kennedy Decl. Ex. B.  On March 13, 2014, Justice Charles Ramos issued an Order to Show Cause why an order should not be made "restraining and enjoining defendants TRC and Putnam from pursuing arbitration relating to any of the reinsurance contracts referenced in defendants' arbitration demand letters to Eaglestone and others dated March 3, 2014."  Kennedy Decl. Ex. C.  The order temporarily enjoined TRC and Putnam from pursuing arbitration against Eaglestone pending a hearing and directed TRC and Putnam to submit their response by March 28, 2014.  *Id.*

On March 21, 2014, TRC and Putnam filed an Answer, Affirmative Defenses, and Counterclaims against Eaglestone in the Eaglestone action asserting a counterclaim that Eaglestone is required "to submit to arbitration as set forth in the arbitration demands."  Kennedy Decl. Ex. D.[3]  On March 28, instead of submitting response papers in the Eaglestone action, TRC

_____

[3]      Like here, TRC and Putnam argued that "[s]ince the LPT, Eaglestone has assumed all of the AIG Insurers' rights and responsibilities . . . ."  *Id.* ¶ 145.  TRC and Putnam also claimed that "Eaglestone has handled the claims . . ., submitted billings directly to TRC,

8

and Putnam withdrew the two Arbitration Demand Letters as to Eaglestone "with prejudice" and

"without reservation".  Kennedy Decl. Exs. E, F, G and I.

**VI.     Despite Conceding That Non-Signatory Eaglestone Need Not Arbitrate, TRC And
         Putnam Continue To Press Non-Signatory NICO To Arbitrate**

    After receiving the Arbitration Demand Letters, NICO filed a complaint seeking

declaratory and injunctive relief against TRC and Putnam in a proceeding styled *National*

*Indemnity Co. v. Transatlantic Reinsurance Co.*, No. 8:14-cv-00074 (D. Neb. Filed March 6,

2014), ECF No. 4  (Amended Complaint).  Thirteen days later, TRC and Putnam filed a

competing petition to compel NICO to arbitrate in New York state court styled *Transatlantic*

*Reinsurance Co. v. National Indemnity Co.*, Index No. 650880/2014 (Sup. Ct. N.Y. Cnty. Mar.

19, 2014).  On March 25, 2014, NICO removed the state court proceeding to this Court.  Notice

of Removal, *Transatlantic Co. v. National Indemnity Co.*, No. 14-cv-2109 (S.D.N.Y. Mar. 25,

2014).  On March 31, 2014, the Nebraska court dismissed NICO's Nebraska proceeding without

prejudice in favor of this proceeding.  Kennedy Decl., Ex. A.

**ARGUMENT**

**I.      TRC And Putnam Are Not "Aggrieved Parties" Under 9 U.S.C. § 4 Because They
         Can Raise Their Defense To Payment In Arbitrations With The AIG Insurers
         Without NICO Being A Party; Therefore The Court Should Not Compel NICO To
         Arbitrate**

    Section 4 of the Federal Arbitration Act (the "FAA") provides that a court may

only compel arbitration in favor of a "[a] party aggrieved by the alleged failure, neglect, or

---

  and collected proceeds under the Treaties from TRC." *Id.*  They further claimed that
  Eaglestone "has received and continues to receive a substantial direct benefit from the
  [AIG-TRC Reinsurance Agreements]." *Id.*

9

refusal of another to arbitrate under a written agreement." 9 U.S.C. § 4 (2012).[4] TRC and
Putnam are not "aggrieved parties" to whom relief can be granted under Section 4 of the FAA.
TRC and Putnam's petition does not identify a claim that they wish to arbitrate against NICO.
TRC and Putnam are not aggrieved because they do not seek money or any other relief from
NICO and NICO does not seek any relief against TRC or Putnam related to the AIG-TRC
Reinsurance Agreements.

TRC's and Putnam's new assertion that NICO is a necessary and proper party to
their arbitrations and disputes with AIG Insurers is simply a litigation tactic designed to
complicate the AIG Insurers' efforts to recover money from TRC and Putnam.  TRC and Putnam
can get complete relief with respect to the AIG-TRC Reinsurance Agreements through their
arbitrations with the AIG Insurers.  If TRC and Putnam owe the AIG Insurers money, the AIG
Insurers can obtain that relief from TRC and Putnam without NICO being a party.  If TRC and
Putnam do not owe the AIG Insurers money, TRC and Putnam can obtain that relief from the
AIG Insurers without NICO being a party.  And if, for some reason, the AIG Insurers owe TRC
and Putnam money, TRC and Putnam can get that relief from the AIG Insurers without NICO
being a party.  TRC and Putnam are not aggrieved by NICO's failure to appear as a party in the
demanded arbitrations simply to observe the AIG Insurers, TRC and Putnam resolve their
disputes.  At most, NICO is a witness and/or document custodian in connection with the
requested arbitrations and NICO will be available to provide discovery as is reasonable and
appropriate.

---

[4]     TRC and Putnam originally brought this case in state court pursuant to CPLR § 7503, the
New York state analog of Section 4.  This Court's authority to compel arbitration would
derive from 9 U.S.C. § 4.

## II.  NICO Cannot Be Compelled To Arbitrate With TRC And Putnam Because It Is Not A Signatory To Any Of The AIG-TRC Reinsurance Agreements And Did Not Otherwise Agree To Arbitrate

It is black letter law that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[5]  "[C]ourts should not assume that the parties agreed to arbitrate . . . unless there is *clea[r] and unmistakabl[e] evidence* that they did so."[6]  It is undisputed that NICO is not a signatory to any of the AIG-TRC Reinsurance Agreements.  There is no other agreement or evidence that TRC or Putnam can point to that NICO agreed to arbitrate because NICO simply did not agree to arbitrate with TRC or Putnam, in writing or otherwise.  Indeed, when NICO and TRC did have a dispute in the past, that dispute was brought and resolved in court.  Snover Decl. ¶ 13 n.1.  TRC and Putnam discuss this Massachusetts lawsuit in their brief but omit mention of the fact that TRC never once asserted at any point in the lawsuit that the parties were required to arbitrate disputes.  *Id.*[7]  TRC's newly-articulated contention that NICO and TRC must arbitrate their

---

[5]   *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("Arbitration is contractual by nature – 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

[6]   *Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996) (emphasis added) (internal quotation marks omitted); *see also Grenawalt v. AT&T Mobility*, LLC, 937 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) ("Arbitration will only be compelled where the parties have expressly agreed to arbitrate in clear and unequivocal language . . . .") (internal quotation marks omitted)).

[7]   TRC and Putnam claim that this Massachusetts lawsuit somehow shows that NICO sought direct benefits from TRC under the AIG-TRC Reinsurance Agreements and therefore is bound to the obligations of the AIG-TRC Reinsurance Agreements through estoppel.  TRC Br. at 12.  This is not the case.  This lawsuit concerned TRC's tortious interference with the Administrative Services Agreement and unlawful impediments to the parties' performance thereunder.  Snover Decl. ¶ 13 n.1; Kuehn Aff. Ex. Q.

11

disputes runs counter to the parties' limited course of dealing. And the law is clear that a party suffers irreparable harm by being forced to arbitrate issues that are not arbitrable.[8]

## III. NICO Has Not Knowingly Exploited The AIG-TRC Reinsurance Agreements For Its Direct Benefit And So Cannot Be Bound To The AIG Insurers' Obligations Under The Agreements By Estoppel

TRC and Putnam acknowledge that NICO did not agree to arbitrate. TRC Br. at 14. Therefore, they attempt to compel arbitration through a judicially-created "estoppel" exception. TRC and Putnam's estoppel theory requires a showing that NICO "knowingly exploited" the AIG-TRC Reinsurance Agreements and received a "direct benefit" from the AIG-TRC Reinsurance Agreements. *See MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001). A "direct benefit" is one flowing directly from the agreement containing the arbitration clause. *Id.*[9] "[T]he benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Id.* TRC and Putnam must prove their estoppel claims through "clea[r] and unmistakabl[e] evidence." *Nat'l Union Fire Ins. Co.*, 88 F.3d at 135 (internal quotation marks omitted). They have not done so and cannot do so.

In practice, the estoppel exception has been almost exclusively applied to circumstances where a non-signatory is resisting arbitration under an agreement signed by a corporate affiliate (including the cases relied on by TRC and Putnam, which are discussed in

---

[8]   *See, e.g., Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations.*, 107 F.3d 979, 985 (2d Cir. 1997) ("[Plaintiff] would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable . . . ."); *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487 (NRB), 2004 WL 307238, at *3 (S.D.N.Y. Jan. 15, 2004) ("Compelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.'").

[9]   *See also In re Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 631 (2013) ("Where the benefits are merely 'indirect,' a nonsignatory cannot be compelled to arbitrate a claim. A benefit is indirect where the nonsignatory exploits the contractual relation of the parties, but not the agreement itself . . . .").

Section III.C below).  NICO is not a corporate affiliate of any signatory to the AIG-TRC

Reinsurance Agreements.

**A.  NICO Has Not "Knowingly Exploited" The AIG-TRC Reinsurance Agreements For Its "Direct Benefit"**

TRC and Putnam have identified no direct benefit that NICO has received or

attempted to receive from the AIG-TRC Reinsurance Agreements.  Instead, TRC and Putnam's

estoppel argument rests on the faulty premise that NICO has knowingly exploited the AIG-TRC

Reinsurance Agreements by "taking over," "supplanting" or "substituting" for the AIG Insurers.

There is no record evidence to support TRC's and Putnam's colorful but conclusory assertions.

As demonstrated below, the record evidence is that NICO works for the AIG Insurers' direct

benefit to collect money TRC owes the AIG Insurers under the AIG-TRC Reinsurance

Agreements.

**1.  The Sworn Statements And Other Evidence Contradict TRC And Putnam's Conclusory Theory That NICO Has "Taken Over," "Supplanted" or "Substituted" For The AIG Insurers**

A NICO representative has submitted a sworn statement attesting to the fact that

NICO has not "taken over," "supplanted" or "substituted" for the AIG Insurers.  Snover Decl. ¶

14.  A representative for the AIG Insurers has submitted a sworn statement confirming that

NICO has not "taken over," "supplanted" or "substituted" for the AIG Insurers and stating that

the direct benefit from recovering under the AIG-TRC Agreements is their own.  Fox Decl. ¶ 10.

There is no contrary record evidence and that should be enough to reject Petitioners' estoppel

argument.

In fact, TRC's affiant, Beth Levene, admits that in the "early spring of 2012, AIG

and TRC were undertaking discussions to resolve globally several issues that remained open

between the companies" including issues under the AIG-TRC Reinsurance Agreements.  Levene

Aff. ¶ 9. Ms. Levene says that several "AIG senior executives were involved in such meetings or communications" including AIG's Chief Reinsurance Legal Officer and Associate General Counsel, the Chief Executive Officer of Chartis, AIG's global property casualty business, and the President of AIG Commercial Insurance and CEO of one of the AIG Insurers. Levene Aff. ¶ 9. If NICO had "completely supplanted" the AIG Insurers in July 2011 as TRC would have the Court believe, TRC would not be negotiating the resolution of its disputes with the AIG Insurers through AIG employees almost a year later. This is particularly true given that Ms. Levene admits that, in July 2012, she sought permission from "AIG, our trading partner" to meet with NICO. Levene Aff. ¶ 13. These facts, sponsored by TRC and Putnam, disproves the assertion that NICO "effectively substituted" itself for the AIG Insurers in July 2011.

Furthermore, while TRC and Putnam claim in their brief that "NICO has assumed AIG's rights and responsibilities under the Treaties", TRC and Putnam have taken the exact opposite position as recently as yesterday. On April 2, 2014, the TRC/Putnam official who initiated the arbitrations at issue (Wesley Sherman) wrote that NICO has "*no rights or authority under [TRC's] contracts with AIG.*" Snover Decl. Ex. C at 1 (emphasis added). This illustrates that TRC does not really believe its litigation position that NICO has assumed the AIG Insurers' rights under the AIG-TRC Reinsurance Agreements because just yesterday it said NICO has no such rights.

### 2.    NICO's Role As A Claims Administrator Does Not Provide It With "Direct Benefits" Under The AIG-TRC Reinsurance Agreements

NICO's role, through its affiliate Resolute, is as a claims administrator, not as one who is exploiting the AIG-TRC Reinsurance Agreements for its own direct benefit. Specifically, with respect to a defined group of asbestos-related claims made by policyholders seeking coverage under AIG Insurers' insurance policies, NICO is responsible for managing those claims

14

and collecting reinsurance for those claims *in AIG Insurers' name and on AIG Insurers' behalf.*
Fox Decl. ¶ 13; Snover Decl. Ex. F at § 6.1.

      The Administrative Services Agreement between NICO and the AIG Insurers expressly states that:

- "[The AIG Insurers] desire that NICO perform certain administrative functions *on behalf of the [AIG Insurers]* from and after the date hereof with respect to the Subject Asbestos Liabilities." *Id.* at 1.

- "Each of the [the AIG Insurers] hereby appoints NICO . . . *as an independent contractor of such [AIG Insurer]* to perform the administrative and other services identified herein as to be performed by NICO . . . , solely within the Scope of this Service and all on the terms, and subject to the limitations, as set forth in this Administrative Services Agreement." *Id.* at § 2.1 (emphasis added).

- NICO accepts such appointment and agrees to perform the Administrative Services *on behalf of [the AIG Insurers]* on such terms and subject to such limitations." *Id.* (emphasis added).

- "NICO shall perform the Administrative Services provided for hereunder (including under the Transition Services Agreement) *on behalf of [the AIG Insurers]* in a professional and competent manner . . . ." *Id.* at § 2.2 (emphasis added).

- "The authority granted NICO in this Administrative Services Agreement . . . , relates solely to matters within the Scope of Service. NICO has no authority to act for or on behalf of the [AIG Insurers] for matters outside the Scope of Service except as expressly set forth within this Administrative Service Agreement and the Transition Services Agreement." *Id.* at § 4.1.

- "In performing the Administrative Services with respect to the Third Party Reinsurance Agreements within the Scope of Service, NICO shall . . . (i) administer and collect, *on behalf of* and in the name of the applicable [AIG Insurer], Included Reinsurance Recoverables and Other Recoverables due in respect of the Subject Asbestos Liabilities in accordance with the contractual terms of the applicable Third Party Reinsurance Agreements." *Id.* at § 6.1(a)(i).

- "NICO, *as administrator on behalf of [the AIG Insurers]*, shall provide such accounts and other information to [the AIG Insurers] and Eaglestone as is necessary . . . ." *Id.* at § 7.1 (emphasis added).

      Were the ASA not clear enough to show that NICO is working *on behalf of the AIG Insurers* and not for its own direct benefit, a NICO Senior Vice-President has submitted a

sworn statement that confirms that (i) "NICO has not sought money for itself under the AIG-TRC Agreements", and (ii) "NICO has not asserted any rights of its own under the AIG-TRC Agreements, and has never expressed an intent to do so." Snover Decl. ¶¶ 11-12. While Petitioners make much of the fact that "NICO directly bills reinsurers – including TRC – for the loss and loss expense that NICO pays with respect to those assumed liabilities" (TRC Br. at 2), that is NICO's job under the Administrative Services Agreement – to pay policyholders and collect money *on behalf of the AIG Insurers*. There is no record evidence that NICO is doing anything but performing that service on behalf of the AIG Insurers.

The speculation of TRC's employee, Beth Levene, about the role NICO is playing in various ongoing litigations and arbitrations between TRC and AIG insurers is wrong and should be disregarded. While Ms. Levene swears that "NICO has controlled and directed AIG's litigation and arbitration proceedings . . . ." (Levene Aff. ¶ 18), Ms. Levene has no first-hand knowledge to support this assertion. In actuality, "NICO has not initiated any proceedings for its own direct benefit to collect reinsurance from TRC or Putnam under the AIG-TRC Reinsurance Agreements." Snover Decl. ¶ 13. Furthermore, Patricia Taylor Fox, the Deputy General Counsel of AIG Property Casualty, Reinsurance Legal, has submitted a sworn statement attesting to the fact that Ms. Levene is wrong and that Ms. Fox's group (Reinsurance Legal) participates with NICO "in the management of the litigation and arbitration proceedings on behalf of the AIG Insurers which are parties to those proceedings." Fox Decl. ¶ 21. Ms. Fox also attests that "the money that TRC owe and Putnam owe under the AIG-TRC Reinsurance Agreements is owed to the AIG Insurers and if the AIG Insurers recover that money they will directly benefit and if they do not recover that money they will be directly harmed." *Id.* at ¶ 15. Ms. Fox attests to the fact that she personally, along with one of her colleagues, oversees the

conduct of certain specific arbitrations and litigations that TRC and Putnam wrongly claim are

controlled by NICO. *Id.* at ¶¶ 19-20. She and her colleague have attended the substantive

hearings in those matters. *Id.* There is no evidence that NICO is the "real party in interest" in

any of these proceedings and there is ample direct evidence to the contrary.[10]

### 3.   NICO's Role As Reinsurer of Eaglestone Does Not Provide It With "Direct Benefits" Under The AIG-TRC Reinsurance Agreements

In 2011, Eaglestone purchased reinsurance coverage from NICO.  Snover Decl.

Ex. D.  The Eaglestone-NICO Retrocession Agreement does not involve TRC.  Like NICO,

Eaglestone is not a signatory to the AIG-TRC Reinsurance Agreements.  TRC has never

cogently explained how NICO's reinsurance contract with Eaglestone could amount to

"knowingly exploiting" the AIG-TRC Agreements for NICO's direct benefit.  It does not.

TRC and Putnam try to mislead the Court by suggesting NICO directly reinsures

the AIG Insurers.  That is not true – NICO reinsures Eaglestone.  *Id.*  TRC and Putnam

emphasize an out-of-context excerpt from Section 3.4 of the Eaglestone-NICO Retrocession

Agreement, which indicates that NICO will receive the "full economic benefit of the Included

Reinsurance Recoverables."   All this means is that Eaglestone cannot recover reinsurance from

NICO when reinsurance for the same loss has already been recovered from reinsurers like TRC.

In other words, it operates to prevent a double recovery.   Nothing in this provision shows that

NICO has exploited or received a direct benefit from the AIG-TRC Reinsurance Agreements.

---

[10]      NICO's position is akin to any other agent a company hires, such as a law firm. Although a law firm may, on a day-to-day basis, "initiate and control legal proceedings", "control communications" and send out communications on its own letterhead, the law firm has not "supplanted" its client nor become the "real party in interest." This is true even if the law firms seeks to recoup money on behalf of and for the benefit of its client and deposits such money in a bank account it controls. NICO is a service provider engaged in fulfilling its role under the Administrative Services Agreement.  NICO is not exploiting the AIG-TRC Reinsurance Agreements for its own direct benefit.

Significantly, TRC and Putnam initially filed a claim seeking to compel Eaglestone to join the same arbitrations under an estoppel theory. Kennedy Decl. Ex. D. On the eve of the hearing, TRC and Putnam withdrew their claim as to Eaglestone with prejudice and without reservation, tacitly admitting that Eaglestone is not required to arbitrate under an estoppel theory (or any other theory). Kennedy Decl. Exs. E, F, G, and I. This is significant because any benefit to NICO from TRC paying money to an AIG Insurer is, by definition, less direct than any benefit Eaglestone receives from TRC paying money to an AIG Insurer. For example, if TRC pays an AIG Insurer $100 under an AIG-TRC Reinsurance Agreement, the AIG Insurer directly benefits because it receives $100. Eaglestone, as a reinsurer of the AIG Insurer, might also indirectly benefit the same way any insurance company or reinsurance company benefits when something good happens to its policyholder (such as it avoiding a loss or obtaining a recovery). NICO, as a reinsurer of Eaglestone, is even further removed. If, as TRC and Putnam concede, the reinsurer of the AIG Insurers (Eaglestone) need not arbitrate alongside the AIG Insurers, surely the reinsurer of the reinsurer of the AIG Insurers (NICO) need not arbitrate alongside the AIG Insurers either.

At bottom, there is nothing in the Eaglestone-NICO Agreement that shows a knowing exploitation of the AIG-TRC Reinsurance Agreements for NICO's direct benefit.

**B.     The Second Circuit's Refusal To Apply The Estoppel Exception In Much More Extreme Circumstances Shows That It Does Not Apply Here**

The Second Circuit has declined to apply the estoppel exception to require non-signatories to arbitrate even where the non-signatory derives far more clear and direct economic benefits under the contract containing an arbitration clause than NICO even arguably does here. For example, in *Thomson-CSF, S.A. v. American Arbitration Association*, the Second Circuit held that a corporate parent of a signatory to an arbitration clause cannot be required to arbitrate

18

under an estoppel theory despite benefits flowing to the parent from the contract containing the

clause. 64 F.3d 773 (2d Cir. 1995). There, the subsidiary had entered into a contract with a third

party containing an arbitration clause in which the subsidiary agreed to exclusively buy from a

third party, and the third party agreed to exclusively supply the subsidiary. The parent purchased

the subsidiary after the contract was signed and integrated the subsidiary into its own business.

The third party sought arbitration with the parent, a non-signatory, arguing that the parent

purchased the subsidiary so that it could keep the subsidiary and third party from competing with

the parent and therefore, it received direct benefits under the subsidiary's agreement with the

third party. *Id.* at 778-79. The Second Circuit found that this benefit could not form the basis for

estopping a non-signatory from avoiding arbitration because the benefit that the third party

asserted "derive[d] directly from [parent's] purchase of [subsidiary], and not from the

[agreement] itself; [parent] received no benefit at all from the [agreement] (as opposed to the

acquisition)." *Id.* at 779. Here, NICO's potential benefit is similarly derived, if at all, from a

business deal with Eaglestone, the AIG Insurers and others. It is not from the AIG-TRC

Reinsurance Agreements.

Likewise, in *MAG Portfolio Consult., GMBH v. Merlin Biomed Grp*. LLC, 268

F.3d 58 (2d Cir. 2001), a company (MAG) was entitled under a contract with an arbitration

clause to 10% of the profits of certain businesses known as the "Old Merlins." *Id.* at 60. The

"Old Merlins" managed investment funds. *Id.* Thereafter, the principal shareholder of the Old

Merlins caused the Old Merlins to resign as fund managers (causing their profits to drop

substantially). *Id.* The principal shareholder then appointed new companies he owned to be

fund managers (the "New Merlins"). *Id.* MAG sought to arbitrate with both the Old Merlins and

the New Merlins on the basis that the benefits of its bargain moved from the original signatories

(the Old Merlins) to the successors (the New Merlins) and thus the successors should be obligated to arbitrate on an estoppel theory. *Id.* at 60-62. The Second Circuit held that "[e]ven assuming a less than arms-length relationship between the old and new Merlins, the most one could say is that the specific terms of the contractual relation between MAG and the old Merlins had been exploited by [the principal shareholder] to the disadvantage of MAG." *Id.* at 63. The Second Circuit overturned the district court's ruling that the New Merlins must arbitrate with MAG and concluded that the estoppel exception did not apply. *Id.* at 65. Here, there is no dispute that the deal between the NICO, Eaglestone and the AIG Insurers was an arms-length transaction. If the New Merlins cannot be required to arbitrate under an agreement signed by the Old Merlins when the New Merlins indisputably took over the Old Merlins' job and share the same owner, certainly NICO cannot be required to arbitrate under agreements signed by AIG Insurers when it neither wholly took over the AIG Insurers' job nor shares the same owner.

In another case, *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, an attorney entered into a fee-division agreement upon his departure from the defendant law firm that included an arbitration clause. No. 08-civ-02152, 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008). After the attorney joined a new law firm, the attorney and the new law firm were awarded substantial attorneys' fees upon settlement of a case. The old law firm disputed the payment of these fees to the new law firm, and sought arbitration with the new law firm over the fees. The old law firm argued that the new firm was estopped from avoiding arbitration because its receipt of the attorneys' fees constituted a "direct benefit" under the fee-division agreement between the attorney and the old law firm. The court found that the new firm "exploited the contractual relation of parties to an agreement by taking over the role of counsel . . . . However, [the new law firm] has not exploited (and thereby assumed) the agreement itself." *Id.* at *6

20

(internal quotation marks and citation omitted).  The court continued, "[the old law firm] claims

an interest, which it argues arises from the Agreement, in the fees paid to [the new law firm], but

that does not necessarily indicate that [the new law firm] directly benefited from the Agreement.

[The new law firm] has, at most, received an indirect benefit from the Agreement, which is

insufficient to employ the estoppel exception." *Id.*  Just as the new law firm did not benefit

directly from the fee-division agreement, but from its relationship with the attorney and its

settlement of the case, so too NICO does not benefit directly from the AIG-TRC Reinsurance

Agreements, but from its relationship with Eaglestone and the AIG Insurers.

        Any benefit received by NICO from the AIG Insurers or Eaglestone is not a direct

result of the AIG-TRC Reinsurance Agreements, but rather is the result of the separate NICO

reinsurance contract and administrative services agreement, neither of which are the contracts

containing arbitration clauses.  Accordingly, NICO's benefit is *far* less direct than the benefits at

issue in *Thomson-CSF*, *MAG Portfolio,* and *Barrack*, which were held in each case to be indirect

benefits that did not require a non-signatory to arbitrate.  The "estoppel" exception no more

applies here than it did in *Thomson-CSF*, *MAG Portfolio,* or *Barrack*.

    **C.**      **The Cases Relied On By Petitioners Are Inapposite**

        TRC and Putnam rely primarily on three cases, *HRH Construction LLC v. Metro.*

*Transp. Auth.*, 33 A.D.3d 568 (1st Dep't 2006), *Alfa Laval U.S. Treasury Inc. v. Nat'l Union*

*Fire Ins. Co. of Pittsburgh, PA*, 857 F. Supp. 2d 404 (S.D.N.Y. 2012), and *Ace Am. Ins. Co. v.*

*Huntsman Corp.*, 255 F.R.D. 179 (S.D. Tex. 2008), none of which remotely resembles the facts

of this case.  First, all of these cases involve circumstances where someone seeks to require a

non-signatory to arbitrate under an agreement signed by the non-signatory's corporate affiliate or

subsidiary whereas NICO is not a corporate affiliate or parent of the AIG Insurers.  Second,

apart from the corporate relationships, all of the cases involve easily distinguishable facts that have no application here.

   *HRH* is a three-paragraph state court decision that required HRH Construction LLC to honor the arbitration obligation agreed to by HRH Construction Interiors, Inc. because HRH Construction LLC purchased the assets of the company that owned HRH Construction Interiors (HRH Construction Corp.). 33 A.D.3d at 569. The asset purchase agreement between these corporate affiliates bears no resemblance to the arms-length transaction entered into between NICO, Eaglestone and the AIG Insurers.

   In *Alfa Laval*, an insurance company issued an insurance policy that provided benefits to a company known as Tetra Laval U.S. Treasury Inc. ("Tetra Laval") and "an affiliated group of multinational companies." 857 F. Supp. 2d at 406. Even though all the affiliated companies received insurance coverage under the policy, only Tetra Laval signed the document with the arbitration clause. *Id.* at 407. Tetra Laval's affiliates argued that they could not be required to arbitrate as they did not actually sign any of the documents in the insurance program. *Id.* at 414-15. The non-signatory affiliates acknowledged that they "received direct benefits from the insurance policies in the form of insurance coverage." *Id.* at 414 (emphasis omitted) (internal quotation marks omitted). The court held that Tetra Laval's corporate affiliates must arbitrate along with Tetra Laval. *Id.* at 415. This case is distinguishable because the relationship between Tetra Laval and its corporate affiliates bears no resemblance to the relationship between NICO and the AIG Insurers, which are not affiliates but are unaffiliated businesses operating under contract rather than corporate relationship. Further, while the non-signatory affiliates of Tetra Laval all acknowledged that they "received direct benefits from the insurance policies", NICO

has established that it has not received any direct benefits under the AIG-TRC Reinsurance Agreements.

*Huntsman* is a decision from the Southern District of Texas that is not applicable for two reasons. First, TRC and Putnam misrepresent the holding of the case. TRC and Putnam claim that the *Huntsman* court compelled arbitration. TRC Br. at 19. That is not correct. The court did not reach the merits of the arbitrability question, finding merely that dismissal was unwarranted at that stage of the case. *See Huntsman*, 255 F.R.D. at 210 ("At this stage, this court is not determining the merits of the underlying disputes, arbitrability, or the appropriate time for arbitration, if any."). Second, the *Huntsman* case involved the question of whether a company can be required to arbitrate when its captive insurance company (i.e., a corporate subsidiary) was a signatory to an arbitration agreement. *See id.* at 185. NICO is not a corporate parent of the AIG Insurers and does not control the AIG Insurers whereas a company controls and receives a direct benefit from its captive insurance company.[11]

## IV.   It Is Improper For This Court To Compel Arbitration Under The 20 AIG-TRC Reinsurance Agreements That Do Not Provide For Arbitration In New York

Section 4 of the FAA provides that the proper venue for bringing a motion to compel arbitration is the court situated in the district where arbitration would proceed. 9 U.S.C. § 4 (2012) ("The hearing and proceedings, under such agreement, shall be within the district in

---

[11]   TRC and Putnam also cite *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 351 (2d Cir. 1999). This case involves a principal (a ship owner) being bound to an arbitration agreement signed by its agent (a ship builder) that was provided to, but not physically signed by, the principal at the time it was entered into. These facts bear no resemblance to the instant dispute where the AIG Insurers have never been NICO's agent and where NICO had no involvement with the AIG-TRC Reinsurance Agreements at the time they were signed.

which the petition for an order directing such arbitration is filed.").[12] Twenty of the 41 AIG-

TRC Reinsurance Agreements do not provide for arbitration in New York.  Thirteen of the AIG-

TRC Reinsurance Agreements expressly provide for arbitration elsewhere:  Boston, MA (5

agreements), Los Angeles, CA (5 agreements), San Francisco, CA (2 agreements), and

Manchester, NH (1 agreements).[13]  The arbitral forum for 7 of the purported AIG-TRC

Reinsurance Agreements is not currently known to NICO because TRC and Putnam have not

provided copies of the agreements or have only provided the abstract, which does not contain the

arbitration provision.[14]  This Court cannot require NICO to arbitrate in Boston, Los Angeles, San

Francisco, or Manchester, let alone in fora that are unknown because TRC and Putnam cannot

come forward with all the agreements that they claim require NICO to arbitrate.

       TRC's and Putnam's argument that this court is "imbu[ed] . . . with the

jurisdiction to compel NICO to submit to arbitration" under all the AIG-TRC Reinsurance

Agreements because "most of" the agreements designate New York as the arbitral venue has no

support in the law and TRC and Putnam cite none.  TRC Br. at 23.  This Court cannot compel

NICO to arbitrate under the 20 AIG-TRC Reinsurance Agreements with non-NY arbitral venues

based on the existence of 21 (or any other number of) separate agreements with New York

arbitral venues.  TRC's and Putnam's other assertion that certain AIG Insurers have agreed with

---

[12]   *See J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 83 (S.D.N.Y. 2010) (court could not compel arbitration to proceed in New Orleans); *Provident Bank v. Kabas*, 141 F. Supp. 2d 310, 315 (E.D.N.Y. 2001) ("Where an agreement to arbitrate specifies a venue outside of the district in which the petition is filed, no order to compel may be entered . . . ."); *Couleur Int'l Ltd. v. Saint-Tropez W., a Div. of Ca. Fashion Indus., Inc.*, 547 F. Supp. 176, 177 (S.D.N.Y. 1982) (denying motion to compel arbitration where the agreement called for arbitration in California).

[13]   *See* Levene Aff. Exs. 2, 10, 30, 31, 32 (Boston); Exs. 3, 4, 8, 15 (Los Angeles); Exs. 5 and 6 (San Francisco); Ex. 21 (Manchester); Fox Decl. Ex. H , Treaty 8705 (Los Angeles).

[14]   *Compare* Levene Aff. Exs. 1-34, *with* Snover Decl. Exs. A and B, at Exhibit 1.

TRC and/or Putnam to arbitrate in New York in the past is irrelevant. TRC Br. at 23-24. Ms. Fox has testified that there is no agreement with TRC or Putnam waiving the arbitral forum provisions of the AIG-TRC Reinsurance Agreements. Fox Decl. ¶ 23. And even if there were such an agreement or "course of conduct" between certain AIG Insurers and TRC or Putnam, NICO would not be bound by any such agreement or conduct.

Finally, TRC and Putnam should be precluded from arguing that the Court can compel arbitration outside of the Southern District of New York based on the arguments that TRC and Putnam advanced and succeeded on in the Nebraska proceeding. TRC and Putnam argued that the Nebraska court should dismiss NICO's claims because it could not grant complete relief to the parties since it could not require NICO to arbitrate outside of Nebraska.[15] The Nebraska court agreed, holding that "where an arbitration provision contains a forum selection clause, the only proper venue in which to compel arbitration is the venue encompassing that forum." Kennedy Decl. Ex. A (citing cases). Between 13 and 20 of the AIG-TRC Reinsurance Agreements contain forum selection clauses for venues not encompassed in this forum. Thus, based on TRC's and Putnam's own position, this forum is not a proper venue in which to compel arbitration with respect to those 20 agreements.

## CONCLUSION

For the foregoing reasons, NICO respectfully requests that the Court deny the petition to compel arbitration and grant such other relief as may be just and proper.

---

[15]   *See, e.g.,* Br. in Opp., *National Indemnity Co. v. Transatlantic Reinsurance Co.,* No. 8:14-cv-00074 (D.Neb. Mar. 20, 2014), ECF No. 26 ("FAA § 4 and abundant case law construing that provision require that petitions to compel or enjoin arbitration be heard by the court where the arbitration is pending (or would be filed).").

DATED: April 3, 2014

Respectfully submitted:

By:  *Stephen M. Kennedy*
     Michael A. Knoerzer (MK 8438)
     Stephen M. Kennedy (SK 5572)
     CLYDE & CO US LLP
     The Chrysler Building
     405 Lexington Avenue, 16th Floor
     New York, NY 10174
     Telephone: (212) 710-3900
     Facsimile: (212) 710-3950

*Attorneys for National Indemnity Company*